[Cite as *State v. Thornton*, 2015-Ohio-5209.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2014-P-0054** |
| JOSEPH E. THORNTON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2014 CR 0012.

Judgment: Affirmed.

*Victor V. Vigluicci*, Portage County Prosecutor, and *Pamela J. Holder*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Paul M. Grant*, 209 South Main Street, Eighth Floor, Suite 3, Akron, OH 44308 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} This appeal is from the sentencing judgment in a criminal action before the Portage County Court of Common Pleas. After an eight-day jury trial, appellant, Joseph E. Thornton, was convicted of murder, a three-year firearm specification accompanying the murder charge, and tampering with evidence. Under his sole assignment, appellant contends that the trial court erred in requiring his trial counsel to choose between a jury instruction on self-defense or an instruction on the lesser-included offense of voluntary

manslaughter. For the reasons that follow, the record supports the conclusion that the trial court's jury instructions were consistent with the submitted evidence.

{¶2} Throughout the entire underlying proceeding, appellant never disputed the fact that he shot and killed his nephew, Jason Canan, on December 25, 2013. Jason was the thirty-eight-year-old son of appellant's sister, Sharon Canan.

{¶3} Following Jason's divorce, he and appellant resided together for over six years. After their first mobile home/trailer was destroyed in a fire, Jason's parents used the insurance proceeds to purchase a new trailer, which was located in a mobile home park in Windham Township, Portage County, Ohio. Title to the new residence was in Sharon's name. During the final year of their arrangement, Jason was not employed on a consistent basis. Thus, appellant had been paying the majority of the bills associated with their residence.

{¶4} As of the date of the incident, appellant and his present girlfriend, Debra Davis, were planning to find a home of their own within thirty days. Therefore, appellant had informed Jason that he would be moving out relatively soon.

{¶5} Although the date of the incident was Christmas Day, Jason had to work a twelve-hour shift that day cleaning a local factory. As a result, he left the trailer for work at approximately 6:00 a.m. Appellant planned to spend part of the day at his sister's home, where he would be able to have dinner with his adult son, Josh, and his family.

{¶6} Appellant only stayed at the family gathering until approximately 2:30 p.m., when Josh gave him a ride back to the trailer. Before going to the trailer, Josh stopped at a local convenience store, where appellant bought a case of beer. Once Josh dropped him off, appellant spent the remainder of the afternoon alone inside the trailer.

However, he did continue to communicate with his girlfriend, Debra, and his other son, Noah, via text messages. In one of his messages to Noah, appellant said: "'Yeah, I've had a hard time not breaking Jason's face. He thinks he's a bad ass. He doesn't know what bad ass is.'" Later in the afternoon, appellant fell asleep in his bedroom.

{¶7} Jason completed his shift at 7:00 p.m., and hitched a ride back home with one of his brothers. Like appellant, while en route to the trailer, Jason stopped and bought beer with his brother.

{¶8} Upon entering the trailer, Jason called back to appellant's bedroom to see if he was still awake. When appellant responded that he was not asleep, Jason walked back to the bedroom, and the two men began to discuss the various events of the day. As their conversation progressed to other topics, the discussion became heated, and Jason began to make derogatory statements about appellant and one of his sons. When the conversation ended, Jason left the bedroom and began to walk rapidly toward the kitchen.

{¶9} Moments after Jason exited the bedroom, appellant grabbed his .357 magnum revolver that he kept near his bed and began to follow Jason down the hallway toward the living room. As appellant entered the living room, he saw that Jason was already standing in the kitchen, beside the countertop that was directly adjacent to the refrigerator. Appellant also saw a butcher knife that was laying on the countertop next to Jason's hand.

{¶10} Over the next few moments, appellant fired his gun twice. The first shot went through the back wall of the kitchen. This bullet ricocheted through the trailer to Jason's back bedroom, where it was recovered from a closet. The second shot went

3

through the back of Jason's skull, killing him instantly.

{¶11} In the minutes immediately after the shooting, appellant did not try to call 9-1-1. Instead, he texted his girlfriend and told her what had just occurred. At first, the girlfriend indicated that she thought appellant was joking. When appellant was able to convince her that he was telling the truth, she asked if she should call 9-1-1. Appellant said "no" to that request, but eventually agreed to allow her to call Jason's parents. Upon receiving the girlfriend's call, Jason's father called appellant directly to confirm the news. The father then contacted the authorities.

{¶12} When Jason's body was originally found by the responding police, it was sitting against the kitchen counter near the refrigerator. Furthermore, one of his hands was holding a knife. However, during his subsequent interrogation, appellant admitted to the police that he placed the knife in Jason's hand after he was dead. The ensuing autopsy of the body also demonstrated that the barrel of appellant's revolver was very near the back of Jason's head when the second shot was fired.

{¶13} After the police concluded their investigation, a three-count indictment was returned against appellant, charging him with murder under R.C. 2903.02(A), tampering with evidence under R.C. 2921.12(A), and obstructing justice under R.C. 2921.32. The murder count also contained a specification that appellant used a firearm to facilitate the offense.

{¶14} At trial, appellant testified on his own behalf. In regard to the statements Jason made during their argument, appellant quoted Jason as saying: (1) appellant and his family were "losers" who had grown up in the "projects" of Windham; (2) he wished that appellant's son had died while serving in Iraq; and (3) he should "kick" appellant out

4

of the trailer immediately. Appellant also stated that, as Jason was exiting the bedroom, he threatened appellant's life. According to appellant, these statements made him mad and fearful at the same time. As to the shooting itself, appellant testified that when he first saw the butcher knife on the countertop, he thought that Jason had his hand on the knife. In addition, he stated that he was approximately ten to fifteen feet from Jason when he fired the first shot, and that Jason was turning and moving toward him at that time.

{¶15} At the close of the evidence, defense counsel moved for jury instructions on self-defense and the lesser included offense of voluntary manslaughter. In relation to the self-defense request, counsel also moved that the instruction expressly state that there is no duty to retreat inside a person's home prior to using lethal force against a co-inhabitant. In discussing the issue, the trial court first indicated that it believed that the evidence only supported an instruction on voluntary manslaughter. The trial court also stated that, in its opinion, instructions on both self-defense and voluntary manslaughter would be logically inconsistent under the facts. As a result, the trial court ultimately held that counsel had to choose between the two instructions. Counsel chose the instruction on voluntary manslaughter.

{¶16} The charge of obstructing justice was dismissed at the close of the state's case. Therefore, the matter went to the jury on the counts of murder with a firearm specification and tampering with evidence. After the jury returned guilty verdicts on all three issues, the trial court sentenced appellant to a life sentence with parole eligibility after fifteen years on the murder charge and a consecutive three-year term on the firearm specification. The trial court imposed a concurrent term of thirty months on the

5

charge of tampering with evidence.

{¶17} In appealing his conviction, appellant has raised one assignment of error for review:

{¶18} "The trial court committed prejudicial error by denying appellant's motion to charge the jury in the alternative with the instruction for self-defense and thereby violating appellant's Fourth and Fourteenth Amendment rights and Article I, Section 14 of the Ohio Constitution."

{¶19} In challenging the trial court's decision to deny his request to instruct the jury on self-defense, appellant has asserted two basic arguments. First, he submits that the trial court erred in concluding that it was not permissible to assert self-defense as an alternative theory when the jury would also be instructed on the lesser-included offense of voluntary manslaughter. Second, he argues that the trial court's proposed instruction on self-defense was error because the court did not intend to tell the jury that appellant did not have a duty to retreat in his own residence.

{¶20} Upon reviewing the record, this court holds that it is unnecessary to decide either of the foregoing arguments in the context of this appeal. Specifically, we hold that appellant's own trial testimony was not sufficient to warrant a jury instruction regarding self-defense.

{¶21} "Under Ohio law, self-defense is an affirmative defense that legally excuses criminal conduct. *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶5, citing *State v. Poole*, 33 Ohio St.2d 18, 19 (1973). The accused bears the burden of going forward with evidence of an affirmative defense and the burden of proving the defense by a preponderance of the evidence. R.C. 2901.05(A). *Id.*" *State*

6

*v. Eichelbrenner*, 1st Dist. Hamilton No. C-110431, 2013-Ohio-1194, ¶19.

**{¶22}** As a general proposition, a trial court is obligated to give a requested jury instruction when: (1) it provides a correct statement of the pertinent law; (2) it is relevant to the facts of the case; and (3) it is not otherwise included in the general charge to the jury. *State v. Imondi*, 11th Dist. Lake No. 2014-L-019, 2015-Ohio-2605, ¶17, quoting *State v. Mitchell*, 11th Dist. Lake No. 2001-L-042, 2003-Ohio-190, ¶10. On appeal, in deciding whether a self-defense instruction was justified, an appellate court must determine "'whether the defendant has introduced sufficient evidence which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.'" *Id.*, at ¶18, quoting *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. Under this standard, evidence which merely raises simple speculation or possible doubt is not sufficient to justify instructing the jury. *State v. Frasca*, 11th Dist. Trumbull No. 2011-T-0108, 2012-Ohio-3746, ¶26, quoting *Melchior*, 56 Ohio St.2d at 20. A trial court's ruling as to the use of a proposed jury instruction will not be reversed on appeal unless an abuse of discretion has occurred. *Id.* at ¶24.

**{¶23}** To establish self-defense, a defendant must satisfy three elements: (1) that he was not at fault in creating the situation; (2) that he had a bona fide belief of imminent danger and his only means of escape from the danger was through the use of sufficient force; and (3) that he did not violate any duty to retreat or avoid the danger. *Id.* at ¶25, quoting *State v. Kovacic*, 11th Dist. Lake No. 2010-L-065, 2012-Ohio-219, ¶22. "Furthermore, to justify the use of deadly force, the record must demonstrate that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm, that his only recourse was to use force, and that he did not violate any duty

7

to retreat or avoid the danger." *Eichelbrenner*, 2013-Ohio-1194, at ¶22, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus.

{¶24} In this case, the record shows that appellant's testimony was not sufficient to satisfy the first element of self-defense; i.e., his own description of the events shows that he was responsible for causing his confrontation with Jason to escalate. According to him, after Jason threatened to kill him and hurriedly left the bedroom, appellant did not merely grab his revolver and then wait in the bedroom to see if Jason was going to act on his threat. Instead, he grabbed his firearm and followed Jason down the hallway and into the living room. To this extent, even if appellant's entire version of the events is believed, it was his actions that caused the confrontation to become more serious. Furthermore, when appellant saw Jason standing beside the knife, he did not make any attempt to talk to Jason and calm him down. Instead, he immediately fired the first shot at Jason.

{¶25} In relation to the "blame" element for self-defense, it has been held that a defendant cannot invoke the defense as a means to become the aggressor before the actual affray has begun. *State v. Perez*, 7th Dist. Mahoning No. 09 MA 30, 2010-Ohio-3168, ¶17. Here, although it was Jason who made the first threat, he had not taken any step to escalate the situation. Rather, it was appellant who grabbed his gun and chased after Jason. Thus, as the aggressor once Jason had left his bedroom, appellant was to blame for changing the situation from a verbal altercation to a physical confrontation.

{¶26} In addition, our review of the trial transcript indicates that, during his direct testimony, appellant never explained what transpired when he fired the second shot. However, the issue was raised during cross-examination. As part of its case, the state

8

played videotapes of interviews appellant had with police officials following his arrest. During appellant's cross-examination, the state then played excerpts from the interviews and gave appellant an opportunity to explain any inconsistencies. After the playing of one such excerpt, the following exchange occurred:

{¶27} "Q. So, you tell Sheriff Doak it looked like he was going to turn to sprint and go towards the sliding glass doors right before you shot him. That's what you told Sheriff Doak.

{¶28} "A. (No response.)

{¶29} "Q. Agreed?

{¶30} "A. Yes.

{¶31} "Q. Is that what he told him? And then, Sheriff Doak, sort of in surprise, says to you - - I believe his words were, 'That didn't cause you to hesitate when you see him try and flee you?' And you say, 'No. No, it didn't.' So you had no hesitation. Jason's trying to escape you, correct?

{¶32} "A. I thought he might be."

{¶33} Pursuant to this testimony, Jason did not pick up the knife and attempt to attack appellant. Rather, he turned toward the sliding doors in an attempt to escape the trailer. Under these facts, appellant was clearly acting as the aggressor. At best, this testimony could only be interpreted to show that appellant was acting under a sudden fit of rage, thereby supporting an instruction on voluntary manslaughter.

{¶34} To prove self-defense, a defendant is required to satisfy each of the three elements. *Frasca*, 2012-Ohio-3746, at ¶25. Therefore, since appellant's trial testimony was not sufficient to establish the "blame" element of the defense, the other elements

need not be addressed. Considered as a whole, appellant's own testimony could only be interpreted to show that it was his aggression that led to Jason's death. Accordingly, appellant was not entitled to a jury instruction on self-defense.

{¶35} In light of the foregoing analysis, any error the trial court may have made in its proposed self-defense instruction is moot. Similarly, it is not necessary to decide whether there can be instances in which instructions on voluntary manslaughter and self-defense can be given in the same case. Appellant's sole assignment of error is not well-taken. The judgment of the Portage County Court of Common Pleas is affirmed.

DIANE V. GRENDELL, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

_____

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶36} I respectfully dissent. Appellant contends the trial court erred in requiring his trial counsel to choose between a jury instruction on self-defense or an instruction on the lesser-included offense of voluntary manslaughter. The majority holds it is unnecessary to decide appellant's arguments in the context of this appeal because his trial testimony was not sufficient to warrant a jury instruction regarding self-defense. The majority asserts appellant's testimony could only be interpreted to show that it was his aggression that led to Jason's death. For the reasons stated, I disagree.

{¶37} "'The decision to issue a particular jury instruction rests within the sound discretion of the trial court.' *State v. Huckabee*, 11th Dist. Geauga No. 99-G-2252, 2001 Ohio App. LEXIS 1122, *18 (Mar. 9, 2001). Absent an abuse of discretion this court will

not reverse the trial court's decision to provide the jury with a specific instruction. *Id.*" *State v. Yates*, 11th Dist. Ashtabula No. 2014-A-0044, 2015-Ohio-3087, ¶59. Regarding this standard, the term "abuse of discretion" is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record. *State v. Ferranto*, 112 Ohio St. 667, 676-678 (1925). An abuse of discretion may be found when the trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶15 (8th Dist.)

**{¶38}** "'Requested jury instructions should be given if they are (1) correct statements of the applicable law, (2) relevant to the facts of the case, and (3) not included in the general charge to the jury.' *State v. Mitchell*, 11th Dist. Lake No. 2001-L-042, 2003-Ohio-190, at ¶10, citing *State v. DeRose*, 11th Dist. Lake No. 2000-L-076, 2002-Ohio-4357, at ¶33, quoting *State v. Edwards*, 11th Dist. Lake No. 2001-L-005, 2002-Ohio-3359, at ¶20." *State v. Imondi*, 11th Dist. Lake No. 2014-L-019, 2015-Ohio-2605, ¶17.

**{¶39}** "'To establish a claim of self-defense, an accused must demonstrate the following: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of bodily harm; and (3) he did not violate any duty to retreat or avoid the danger. *State v. Melchior* (1978), 56 Ohio St.2d 15, 20-21 * * * (* * *)." *State v. Johnson*, 11th Dist. Lake No. 2005-L-103, 2006-Ohio-2380, ¶19, quoting *State v. Mogul*, 11th Dist. Trumbull Nos. 97-T-0018 and 97-T-0067, 1998 Ohio App. LEXIS 2186, *8 (May 15, 1998).

**{¶40}** With regard to self-defense, "'[t]here is no duty to retreat from one's home.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶73, quoting *State v. Williford*, 49 Ohio St.3d 247, paragraph two of the syllabus (1990); *State v. Peacock*, 40 Ohio St. 333 (1883). "In Ohio, [because] one is not required to retreat from one's own home when attacked by an intruder; similarly one should not be required to retreat when attacked by a cohabitant in order to claim self-defense." *State v. Thomas*, 77 Ohio St.3d 323, 327 (1997). This court has held that "[i]t was error for the trial court to fail to give the *Peacock* rule instruction on the 'duty to retreat' element of self-defense." *State v. Marsh*, 71 Ohio App.3d 64, 69 (11th Dist.1990).

**{¶41}** In this case, appellant and Jason were uncle and nephew, respectively, and lived together in a trailer. Because appellant and Jason were residents of the same dwelling where the incident took place, the castle doctrine presumption does not apply. *See* R.C. 2901.09(B) and 2901.05(B)(2)(a). Thus, appellant had the burden to prove the elements of self-defense. *See State v. Montgomery*, 12th Dist. Clermont No. CA2015-03-028, 2015-Ohio-4652, ¶13.

**{¶42}** On Christmas 2013, appellant fatally shot Jason inside the trailer. Appellant was arrested and charged with murder, tampering with evidence, and obstructing justice. The matter proceeded to a jury trial where appellant took the stand in his own defense.

**{¶43}** Appellant testified regarding Jason's prior hostility toward him which included instances of a physical, violent nature. On the night of the incident at issue, appellant indicated that Jason had been drinking, became very angry, and focused his anger on appellant. Jason was yelling at appellant in a very agitated manner that he

12

was going to kill him. Appellant was afraid that Jason was going to kill him. Appellant saw Jason in the kitchen with a knife. They were about 10 feet away from each other. Appellant fired two gunshots. The first shot went through a wall. Jason moved toward appellant. Appellant fired a second shot which instantly killed Jason. Appellant then texted Debra, his girlfriend, telling her what had happened.

**{¶44}** At the close of the evidence, appellant moved the trial court to instruct the jury that there is no duty to retreat from one's own home with respect to a claim of self-defense. The court denied appellant's request. Appellant also sought to have the jury instructed on the alternative theories of voluntary manslaughter and self-defense. The court denied that request as well. The court required appellant to choose between an incomplete instruction for self-defense or voluntary manslaughter. Appellant chose the instruction on voluntary manslaughter. The jury found appellant guilty of murder and tampering with evidence. The obstructing justice charge was dismissed.

**{¶45}** Based on the facts presented, I agree with appellant that the trial court erred in refusing to not give the requested jury instructions. Defense counsel was left with the precarious decision of choosing an incomplete jury instruction on self-defense or choosing an instruction on voluntary manslaughter, which appellant had not argued throughout the case. The trial court erroneously based its decision that the two jury instructions were "mutually exclusive." *See State v. Garltic*, 8th Dist. Cuyahoga No. 90128, 2008-Ohio-4575, ¶22 ("Requesting instructions on both an inferior degree offense * * * and self-defense is permissible. While courts have deemed it reasonable trial strategy for defense counsel to elect one theory over the other, the alternative

13

claims are not mutually exclusive and the trial court must instruct a jury on both if the defense requests it and the evidence warrants it.")

{¶46} I believe the evidence in this case warranted jury instructions on both self-defense and voluntary manslaughter. The trial court's refusal to so instruct the jury denied appellant of his right to due process. Accordingly, I respectfully dissent.