[Cite as *State v. Thomas*, 2019-Ohio-2795.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2017-P-0094** |
| JAVON M. THOMAS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 2017 CR 00022.

Judgment: Reversed and remanded.

*Victor V. Vigluicci,* Portage County Prosecutor, and *Pamela J. Holder,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Neil P. Agarwal*, 3732 Fishcreek Road, #288, Stow, OH 44224 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Javon M. Thomas, appeals his convictions and sentence for Murder, Felonious Assault, and Negligent Homicide, following a jury trial in the Portage County Court of Common Pleas. The issues to be determined by this court are whether counsel is ineffective and reversible error is committed when a castle doctrine instruction is not requested or given in a case where there is evidence to support an affirmative defense of self-defense and whether the trial court errs in failing to admit text messages that have been extracted from a phone but the owner of the

phone is not identified. For the following reasons, we reverse the judgment of the court below and remand for further proceedings consistent with this opinion.

{¶2} On January 12, 2017, the Portage County Grand Jury issued an Indictment, charging Thomas with Murder (Count One), an unclassified felony, in violation of R.C. 2903.02(A), and Murder (Count Two), an unclassified felony, in violation of R.C. 2903.02(B). A Supplemental Indictment was filed on March 31, 2017, charging Thomas with two counts of Aggravated Murder (Counts Three and Six), unclassified felonies, in violation of R.C. 2903.01(A); Murder (Count Four), an unclassified felony, in violation of R.C. 2903.02(A); Murder (Count Five), an unclassified felony, in violation of R.C. 2903.02(B); and two counts of Felonious Assault (Counts Seven and Eight), felonies of the second degree, in violation of R.C. 2903.11(A)(2) and (D). All eight counts had firearm specifications pursuant to R.C. 2941.145.

{¶3} A trial was held on October 4 through 12, 2017. The following pertinent testimony was presented:

{¶4} On the night of January 6, 2017, and into the early morning hours of January 7, Sadie Ochsenbine held a small party at her apartment with friends and coworkers. Present at the party were Thomas, whom Ochsenbine described as having an "off and on" relationship with her, his friend Marlon Daniels, Destany Dixon, and Ochsenbine's coworkers, Austin Tiller and Rachel Gundlach. Ochsenbine testified that Thomas "periodically" spent nights at her residence, sometimes staying a few days or a week there. During the party, they played a drinking game and a virtual reality game. At one point, Dixon and Thomas got into a verbal argument over a joke Thomas made about Dixon playing the virtual reality game rather than drinking. Ochsenbine testified

2

that Tiller intervened to calm the situation, but Dixon stopped socializing, made a phone call, and left soon thereafter.

{¶5}  According to Ochsenbine, about an hour later, Dixon, who lived in an upstairs apartment, called and said she would return.  Dixon entered the apartment with her boyfriend, Brian Brack.  Ochsenbine stated the others in the room had never met Brack and did not know him.  She described Dixon and Brack as having an "attitude," smirking upon entering, and immediately proceeding to sit on the couch.  Brack made a comment about everyone being quiet and Ochsenbine responded there was no reason for him to be there.  He then stood up, "drew his weapon [from his jacket pocket] and said that no one was going to disrespect his girlfriend."  He pointed his weapon at Thomas, who had his weapon pointed at Brack.  Ochsenbine then heard shots being fired and saw Thomas "backing up" toward the hallway in the apartment.  People began running, she saw Tiller on the floor, and called 911.

{¶6}  Marlon Daniels also described the argument between Thomas and Dixon arising from a joke.  Dixon left the party and returned with Brack around 4 or 4:15 a.m.  Daniels testified that he believed immediately when Brack entered he had a firearm in his hands because of the way he had his hands in his pockets.  Daniels testified that Dixon had body language that he interpreted as meaning "what are you going to do now" directed toward Thomas.

{¶7}  After the two sat down, Daniels heard Brack make several statements about it being quiet in the apartment and have a verbal exchange with Ochsenbine.  Daniels heard the sound of a round being placed in the chamber of a gun, coming from Thomas' direction and heard Thomas say, "It's not going down like that."  He looked up

3

and saw Thomas' hands were empty. Brack then pulled out a gun, reached around Dixon, pointed it at Thomas, and Daniels jumped behind the couch. He heard multiple shots but did not know who fired them. After the shooting, Thomas said something like, "I had no choice" or "look what he made me do." Daniels believed Thomas saved his life that day.

{¶8} Rachel Gundlach testified that following the joke, Dixon had "threatened to call people," or "have her people come and talk to" Thomas, spoke on the phone, and left around 3 a.m. She returned with Brack around 4 a.m. The two sat down on the couch and Ochsenbine asked why they were there. Gundlach looked over and saw Thomas had a gun in his lap and looked upset. Thomas stood up with his gun "and then almost simultaneously," Brack stood up with his gun and they started shooting. She testified that she believed Thomas shot first, although indicating it happened very fast. Gundlach stated that she had not felt threatened when Brack entered and he did not do anything aggressive.

{¶9} On cross-examination, Gundlach's taped interview with police after the incident was played in which she had stated that Brack stood up first and pointed his gun at Thomas, which was when the shooting started. Gundlach testified that she believed Thomas had stood up first but she could not remember exactly.

{¶10} According to the testimony of Ravenna Police Department Sergeant Dustin Svab and Patrolman Andrew Wert, they arrived at the apartment complex following a 911 call and encountered Thomas driving out of the complex. He was stopped, detained, and Patrolman Wert recovered an unloaded Magnum Research Micro .380 firearm from his left front pocket. Sergeant Svab responded to the scene of

4

the shooting and saw Brack lying in the shared hallway outside of Ochsenbine's apartment, deceased. Tiller was lying in the living room of the apartment and had also passed away. Dixon had gone upstairs to her mother's apartment and had gunshot wounds to her legs.

{¶11} Daniel Winterich, a special agent with the Ohio Bureau of Criminal Identification and Investigation (BCI), examined the crime scene and located bullet holes on a couch cushion and nearby fast food container. Two bullets were recovered from that section of the couch, where witness testimony established Dixon had been sitting, and one was recovered from the television across the room. A Kel-Tec .9mm gun, which testimony established was used by Brack, was located on the floor near the front door of the apartment. Two casings from the Kel-Tech were located near the couch where Brack was sitting. Five casings from Thomas' Magnum Research Micro .380 were located primarily in the corner of the room near where Thomas had been sitting.

{¶12} Dr. Todd Barr, Deputy Medical Examiner for the Summit County Medical Examiner's Office, performed autopsies in this matter. Brack suffered a gunshot wound to his foot and chest, with the chest wound being the cause of death. Barr testified the angle of the bullet projected downward, which could have been consistent with him either sitting or standing at the time he was shot. Tiller suffered four gunshot wounds, one in his thigh and three that entered through his back. Dr. Dean DePerro, the Portage County Coroner, ruled that the manner of death for both victims was homicide.

{¶13} Dr. Arnold Feltoon treated Dixon at the University Hospitals Portage Medical Center, testifying that she suffered gunshot wounds to both of her thighs. A

5

bullet had passed through her right leg and a bullet remained in her left leg because it would cause no long-term damage.

{¶14} Johnathan Gardner, who works in the firearms section of the BCI, testified that Brack's firearm, a .9mm Kel-Tech, was the source of the bullet fragment in Tiller's hip and the bullet in the television. He testified that the bullets recovered in Brack's body and two located on the couch were fired from Thomas' firearm, the Magnum Research .380.

{¶15} Samuel Troyer, a BCI forensic DNA analyst, testified that one of the bullets recovered from the couch contained the DNA of both Tiller and an unidentified female.

{¶16} Robert Wain, the information technology director for the Ravenna Police Department testified that he extracted data from a phone suspected to belong to Dixon and prepared a report of messages on the phone. The State objected to any questions regarding the records, arguing they would need to be authenticated by the phone company or Dixon. Defense counsel's argument that the text conversations should be admissible since they were retrieved by the witness was rejected by the trial court and no testimony or evidence relating to the content of the messages was permitted.

{¶17} Dwayne Kaley, a detective for the Ravenna Police Department testified that he recovered a phone from the hallway outside of apartment 301, the floor above Ochsenbine's apartment, a warrant was obtained to search the phone, and the police identified the phone as belonging to Dixon, although there was no testimony as to how that was determined.

{¶18} Following the close of the State's case, Thomas moved for dismissal

6

pursuant to Crim.R. 29. The court dismissed Counts Three and Six, the Aggravated Murder charges.

{¶19} For the defense's case, Thomas testified that he had been dating Ochsenbine on the date of the incident and stayed at her apartment a couple of times a week. The day of the party, he was carrying his gun, for which he had a concealed carry permit. He did not have a round in the chamber because the gun has no safety. During the party, Thomas made a joke about Dixon not drinking, she became upset, and started texting, got on her phone, and made a comment to the person on the phone that Thomas had been "talking to [her] crazy." She left but returned later with Brack, whom Thomas did not know. Thomas testified that as they were walking in, he saw Brack place a gun into his jacket pocket and then keep his hand in his pocket "like he was still holding it." Thomas was afraid when he saw the gun so, when Brack turned his back to close the door, Thomas reached for his firearm out of his jacket pocket, placed it in his lap, and covered it with his hand.

{¶20} Thomas testified that, based on Brack and Dixon's demeanor, he believed they were "trying to start an issue." Brack made a comment about how everyone was quiet and had nothing to say. Dixon mumbled "say something now," directed toward Thomas. Brack said that no one should be "talking to my girl crazy," started pulling his gun, and leaned forward in his seat. Once he pulled his gun, Thomas chambered a round. Brack pointed his gun at his face and Thomas lifted his gun. As Thomas began to get up from the chair, Brack fired. Thomas testified that he stumbled backwards into the wall, heard another shot, and began firing his gun rapidly toward Brack in self-defense, and ran into the back room. Afterward, he went into the hallway and told a

7

neighbor to call the police. He was afraid other people might be coming but did not see anyone. He began driving out of the parking lot but was stopped by police.

{¶21} The jury found Thomas guilty of Counts Two, Five, Seven, and Eight, and the lesser included offense of Negligent Homicide on Count Four, as well as the accompanying firearm specifications. The jury found him not guilty on Counts One and Four as charged in the indictment. The verdict was memorialized in an October 12, 2017 Order and Journal Entry.

{¶22} A sentencing hearing was held on November 27, 2017, and the sentence was memorialized in a November 29, 2017 Order and Journal Entry. The court sentenced Thomas to serve consecutive terms of 15 years to life for each count of Murder (Counts Two and Five) and three-year terms on the two accompanying firearm specifications, to be served consecutively with each other and with the Murder sentences. He was sentenced to terms of four years for each offense of Felonious Assault (Counts Seven and Eight) to be served concurrently with each other and the other sentences. The firearm specifications for those counts were ordered to be served consecutively with each other but concurrent to the aforementioned sentences. Finally, he was ordered to serve a concurrent term of 180 days in jail for the lesser included offense of Negligent Homicide. Thomas was also notified that he would be supervised under three years of mandatory postrelease control.

{¶23} Thomas timely appeals and raises the following assignments of error:

{¶24} "[1.] The trial court committed reversible error in refusing to allow into evidence text messages from an absent witness's cell phone.

{¶25} "[2.] The trial court committed reversible and plain error by not giving a

8

self-defense jury instruction under the castle doctrine, R.C. 2901.09.

{¶26} "[3.] Appellant was denied his constitutionally guaranteed right to effective assistance of counsel when his trial counsel failed to object to the trial court's instruction on self-defense and [did] not request a jury instruction under the castle doctrine, R.C. 2901.09.

{¶27} "[4.] Defendant's two convictions for felonious assault are based upon insufficient evidence and are against the manifest weight of the evidence.

{¶28} "[5.] The trial court committed reversible and plain error when it failed to merge Defendant's conviction[s] for murder and negligent homicide for sentencing purposes, as they were allied offenses of similar import.

{¶29} "[6.] The trial court committed reversible and plain error when it failed to merge Defendant's two conviction[s] for felonious assault for sentencing purposes, as they were allied offenses of similar import.

{¶30} "[7.] The trial court committed reversible and plain error by sentencing the defendant to consecutive sentences in violation of R.C. 2929.14(C) and in violation of his rights to due process.

{¶31} "[8.] The trial court committed reversible and plain error when it sentenced the defendant without properly giving him all the notifications concerning post-release control.

{¶32} "[9.] The cumulative effect of the trial court's errors denied defendant a fair trial."

{¶33} For the purpose of clarity, the assignments of error will be considered out of order. In his second assignment of error, Thomas argues that the trial court

committed plain error by not giving a "castle doctrine" instruction in addition to the other self-defense instructions. In his third assignment of error, he argues, alternatively, that trial counsel was ineffective by failing to request such an instruction, resulting in prejudice.

{¶34} Thomas concedes that the standard of review for the failure to give the instruction is plain error since trial counsel failed to object. "If there was no formal objection and the record does not reveal a material dispute over the jury instructions, appellate review must be limited to plain error under Crim.R. 52(B)." *State v. Kiehl*, 2016-Ohio-8543, 78 N.E.3d 1226, ¶ 25 (11th Dist.). Pursuant to Crim.R. 52(B) "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To show plain error, a defendant must demonstrate that "(1) there was an error, (2) the error was 'plain,' i.e., obvious, and (3) the error affected substantial rights." *State v. Tench*, ___ Ohio St.3d ___, 2018-Ohio-5205, ___ N.E.3d ___ ¶ 217. "Plain error exists when it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001).

{¶35} As to his claim of ineffective assistance of counsel, Thomas is required to demonstrate "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant

must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶36} Self-defense is an affirmative defense which permits the defendant "to use that force which is reasonably necessary to repel the attack." *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). The courts of this state have held that "where the state is required to prove beyond a reasonable doubt every element of a crime as defined by statute, the defendant may fairly be required to prove, by a preponderance of the evidence, the affirmative defense of self-defense." *State v. Jackson*, 22 Ohio St.3d 281, 283, 490 N.E.2d 893 (1986). To establish self-defense, a defendant must satisfy three elements: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *State v. Kovacic*, 2012-Ohio-219, 969 N.E.2d 322, ¶ 22 (11th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).[1]

{¶37} "As a general proposition, a trial court is obligated to give a requested jury instruction when (1) it provides a correct statement of the pertinent law;

---

1. We note, for the purpose of clarity, that there has been a statutory amendment to the law regarding self-defense subsequent to Thomas' convictions, although it does not apply retroactively. Pursuant to R.C. 2901.05(A), the requirement for a defendant to prove an affirmative defense by the preponderance of the evidence no longer applies to "self-defense, defense of another, or defense of the accused's residence as described in division (B)(1) of this section." Division (B)(1) as amended adds the following: "A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be."

11

(2) it is relevant to the facts of the case; and (3) it is not otherwise included in the general charge to the jury." *State v. Thornton*, 11th Dist. Portage No. 2014-P-0054, 2015-Ohio-5209, ¶ 22.

**{¶38}** Here, the trial court gave the jury several instructions relating to self-defense, including the three elements of self-defense and that Thomas had a duty to retreat if he was at fault or did not have reasonable grounds to believe that he was in danger. The jury was also instructed that Thomas "is presumed to have acted in self-defense when using defensive force that was intended to cause death or great bodily harm to another if the person against whom the defensive force was used had entered, *unlawfully and without privilege to do so*, the residence occupied by the Defendant," as set forth in former R.C. 2901.05(B)(1). (Emphasis added.) The court did not instruct the jury that "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense," as is set forth in R.C. 2901.09(B), also known as the "castle doctrine."

**{¶39}** The castle doctrine arises from the maxim that a man's home is "his castle" and "has long been a cherished part of American law * * *." *State v. Comer*, 4th Dist. Gallia No. 10CA15, 2012-Ohio-2261, ¶ 11. This is a long-standing principle that has been applied by Ohio courts and is codified in R.C. 2901.09(B). *State v. Peacock*, 40 Ohio St. 333, 334 (1883) ("[w]here one is assaulted in his home, or the home itself is attacked, he may use such means as are *necessary* to repel the assailant from the house * * * even to the taking of life").

**{¶40}** As noted above, the court did give an instruction that there is a presumption of self-defense when a person enters a residence unlawfully, pursuant to

12

former R.C. 2901.05(B)(1), although said instruction does not discuss a duty to retreat. This is not a substitute for a castle doctrine (or a no duty to retreat) instruction, which was more properly applicable in this circumstance. There was no assertion that Brack entered the apartment unlawfully, as he came with his girlfriend, Dixon, an invited guest. *See State v. Dale*, 2d Dist. Montgomery No. 2012 CA 20, 2013-Ohio-2229, ¶ 18 (distinguishing between the proper instructions for victims who have lawfully or unlawfully entered the residence). Further, there is no question that the residence requirement was met. A residence for the purposes of the castle doctrine is described as "a dwelling in which a person resides either temporarily or permanently or is visiting as a guest." R.C. 2901.05(D)(3); R.C. 2901.09(A) ("[a]s used in this section, 'residence'" has the same meaning "as in section 2901.05 of the Revised Code"). Thomas was an invited guest of Ochsenbine's at the time of the party and often lived in her apartment for days at a time. Thus, a castle doctrine instruction should have been given under these circumstances.

{¶41} The State does not refute the foregoing but, rather, argues that Thomas failed to demonstrate he was not at fault in creating the situation and did not prove he acted in self-defense. Thus, giving a no duty to retreat instruction would not have changed the outcome of the trial.

{¶42} The State's premise that Thomas failed to prove he was not at fault is based upon it weighing the evidence in a manner favorable to that outcome, specifically emphasizing the testimony from Daniels that he heard Thomas chamber a round prior to Brack pulling out his firearm and Rachel's testimony that she saw Thomas with his gun out first although Brack had made no threats or aggressive movements. This leads

13

to the State's conclusory statement that "[t]he evidence at trial established Appellant was the first to stand and aim his gun" and that he "was the first aggressor."

{¶43} These arguments are based on selective conclusions rather than a full picture of the evidence presented to the jury. While there was testimony from some of the witnesses that Thomas had his gun out first, there was also testimony that it was hidden from view of others and that no one in the room noticed it, supporting a conclusion that merely having the weapon out did not place Thomas at fault for causing the shooting. Multiple witnesses also testified that Brack and Dixon's behavior implied they were coming to the apartment seeking a conflict. Perhaps most importantly, Daniels, Ochsenbine, and Thomas testified that Brack pointed his weapon at Thomas first, with Thomas testifying Brack was the first to shoot. Further, Gundlach, while testifying at trial that she was not sure who shot first, had initially told police that Brack stood up and shot at Thomas first. Here, there were issues of credibility that are for the trier of fact to decide and "an appellate court may not substitute its own judgment." *State v. Starkey*, 11th Dist. Ashtabula No. 2017-A-0022, 2017-Ohio-9327, ¶ 52, citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). Further, whether the elements of self-defense are met when there are factual disputes is also an issue for the trier of fact. *Dale*, 2013-Ohio-2229, at ¶ 29.

{¶44} Several courts have addressed similar situations and found that the failure for the jury to be given a castle doctrine instruction was reversible error, under a plain error standard or due to ineffective assistance of counsel. In *State v. Lewis*, 2012-Ohio-3684, 976 N.E.2d 258 (8th Dist.), the appellate court held that, where the defendant was a resident of the home where the murder occurred but no castle doctrine instruction was

14

given, this constituted plain error and he "did not receive a fair trial because the jury did not deliberate with a complete set of instructions." *Id.* at ¶ 20-23. In *Dale*, where the defendant and the victim gave two separate versions of events leading to a shooting which occurred at the defendant's residence, the court rejected a plain error argument but held that the jury could have found that the elements of self-defense were met, and, thus, defense counsel was ineffective by failing to request a castle doctrine instruction. *Id.* at ¶ 29. *See also Parma v. Treanor*, 2018-Ohio-3166, 117 N.E.3d 970, ¶ 26-32 (8th Dist.) (when there was "sufficient evidence of such nature and quality to warrant an instruction on self-defense" and the castle doctrine instruction was not given, reversal of the defendant's convictions was required).

**{¶45}** As such, there was evidence presented to the jury both supporting and contradicting Thomas' claim of self-defense. The jury certainly could have found by a preponderance of the evidence, the standard applicable at that time, that Thomas was not at fault for the incident that gave rise to his self-defense claim. It is highly possible under these facts that, since the jury was not instructed as to the castle doctrine, it may have found Thomas guilty because "it might have believed that appellee was under a duty to retreat from his home." *Williford*, 49 Ohio St.3d at 250, 551 N.E.2d 1279.

**{¶46}** While we recognize that under the plain error standard our review is limited to instances where the outcome of the trial clearly would have been otherwise, the standard for ineffective assistance requires us only to determine whether there was a reasonable probability of a different result had the castle doctrine instruction been given. We find this to be the case based on the circumstances described above. Given the conflicting versions of events, "[a]n instruction on the castle doctrine could have

15

established a critical element of [the defendant's] self-defense claim, and there was no strategic basis to omit such an instruction." *Dale* at ¶ 27. Counsel was ineffective by failing to request such an instruction since there is a reasonable probability that the outcome would have been different if the proper jury instruction had been given.

{¶47} For these reasons, and since all of the charges for which Thomas was convicted hinged upon the issue of self-defense, we reverse Thomas' convictions on all six counts and remand this matter to the trial court for a new trial.

{¶48} The third assignment of error is with merit. Thus, the second assignment of error is moot.

{¶49} In his first assignment of error, Thomas argues that the trial court erred by not permitting him to introduce as evidence text messages from Dixon's phone in the absence of her testimony. He contends that since the phone in question was located outside of an apartment near where the shooting took place, the court issued a warrant to extract data from Dixon's phone, and the information technology director did extract evidence and was called as a witness, the content of the messages should have been admitted. The State contends that since Thomas failed to demonstrate that the cell phone actually belonged to Dixon, the trial court properly excluded the extraction report.

{¶50} We acknowledge that this assignment is rendered moot by the determination to reverse and remand for a new trial due to the improper jury instruction. However, for the sake of judicial economy and to prevent possible error at a subsequent trial, we will briefly address this assignment for the purposes of explaining the proper authentication of cell phone records.

{¶51} It must be emphasized that there is a "low threshold standard" for proving

16

the authenticity of evidence. There is no requirement to present "*conclusive* proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be." (Citation omitted.) *State v. Guyton*, 2016-Ohio-8110, 74 N.E.3d 939, ¶ 25 (11th Dist.). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). In other words, the party seeking admission of the evidence need only demonstrate there is a "reasonable likelihood that the evidence is authentic." (Citation omitted.) *State v. Bickerstaff*, 11th Dist. Ashtabula No. 2014-A-0054, 2015-Ohio-4014, ¶ 18. "Any question about the reasonableness of the inferences" to be drawn from cell phone record evidence is "an issue of weight rather than admissibility." *State v. Irvine*, 9th Dist. Summit No. 28998, 2019-Ohio-959, ¶ 31.

{¶52} The trial court determined that there was not sufficient evidence of authentication of the records since there was no direct testimony from a witness who knew the phone belonged to Dixon or cell phone records to establish the number tied to the phone was utilized by her. Given the low threshold for admissibility, we emphasize that there are a multitude of ways in which the cell phone text messages could be authenticated such that they would be admissible.

{¶53} While in many cases text messages are authenticated by the testimony of the recipient, *Bickerstaff* at ¶ 17, this is by no means the only method of authentication. For example, if police officers can provide circumstantial evidence demonstrating a belief that the phone belonged to a certain party, such as identifying it by a unique ringtone and hearing the owner speak to a woman on the phone who was named in the

17

cell phone data extraction reports, this can be sufficient to establish ownership of the phone for the purpose of authenticating cell phone text message records. *State v. Norris*, 2016-Ohio-5729, 76 N.E.3d 405, ¶ 39-43 (2d Dist.). In relation to the content of the text messages, which the trial court here did not consider, we note it has been held that the content of a conversation can be used to authenticate the speaker in a phone call when a defendant's voice could not otherwise be identified, since the content provided "sufficient foundational evidence" to demonstrate the defendant was the one speaking. *See State v. Carr-Poindexter*, 2d Dist. Montgomery No. Civ.A. 20197, 2005-Ohio-1571, ¶ 25. Additionally, testimony and records that establish subscriber information, either through a representative of a cell phone company or an individual with experience reviewing said records, provide another valid method of authentication. *State v. Blake*, 2012-Ohio-3124, 974 N.E.2d 730, ¶ 30 (12th Dist.); *Irvine* at ¶ 30. Such methods, by demonstrating a link to Dixon's ownership and/or use of the cell phone, would be sufficient for the purposes of authentication.

{¶54} Furthermore, it appears that the text messages in question could aid the defense in establishing the circumstances under which Brack entered the party, adding potential support to the conclusion that he was the aggressor. Contrary to the State's argument, then, such messages would be relevant.

{¶55} While we need not rule on whether the lower court erred in excluding the text message records for the purposes of this appeal, nothing in this court's ruling precludes the defendant from seeking to have the records properly admitted in a subsequent trial.

{¶56} Having made the foregoing clarifications, we find the first assignment of

error moot.

{¶57} Given that the convictions must be reversed and a new trial held, the remaining assignments of error, which relate to the weight of the evidence as to the Felonious Assault convictions and alleged errors in sentencing are rendered moot. Thus, we decline to address the fourth through ninth assignments of error.

{¶58} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas is reversed and remanded for further proceedings consistent with this opinion. Costs to be taxed against the appellee.

THOMAS R. WRIGHT, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.