[Cite as *State v. Jackson*, 2023-Ohio-4368.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

　　　　Plaintiff-Appellee,

- vs -

WILLIAM J. JACKSON,

　　　　Defendant-Appellant.

CASE NO. 2023-L-021

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 000558

## O P I N I O N

Decided: December 4, 2023
Judgment: Affirmed in part, reversed in part, and remanded

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Edward M. Heindel*, 2200 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, William J. Jackson, appeals his convictions and sentence for Attempted Murder and Improperly Discharging a Firearm into a Habitation or School Safety Zone. For the following reasons, we affirm Jackson's convictions but reverse the sentence and remand for further proceedings consistent with this Opinion.

{¶2} On July 6, 2020, the Lake County Grand Jury returned a seven-count Indictment against Jackson with the principal charge being Attempted Murder. Following a jury trial, Jackson was found guilty of five of the seven counts and received an aggregate

stated minimum prison term of eleven years and a maximum term of twelve and one-half years.

{¶3} Jackson appealed his convictions and this Court reversed and remanded for retrial. *State v. Jackson*, 11th Dist. Lake No. 2021-L-018, 2022-Ohio-3483.

{¶4} The State appealed Jackson's sentence and this Court dismissed the appeal as moot in light of its reversal of Jackson's convictions. *State v. Jackson*, 11th Dist. Lake No. 2021-L-016, 2022-Ohio-3481.

{¶5} On remand, Jackson was retried on the following charges renumbered from the original Indictment: Attempted Murder (Count 1), a felony of the first degree in violation of R.C. 2923.02 and 2903.02(A) with Firearm Specifications as set forth in R.C. 2941.145 and 2941.146; Felonious Assault (Count 2), a felony of the second degree in violation of R.C. 2903.11(A)(2) with Firearm Specifications as set forth in R.C. 2941.145 and 2941.146; Improperly Discharging a Firearm at or into a Habitation or School Safety Zone (Count 3), a felony of the second degree in violation of R.C. 2923.161(A)(1) with Firearm Specifications as set forth in R.C. 2941.145 and 2941.146; Improperly Discharging a Firearm at or into a Habitation or School Safety Zone (Count 4), a felony of the second degree in violation of R.C. 2923.161(A)(1) with Firearm Specifications as set forth in R.C. 2941.145 and 2941.146; and Improperly Handling Firearms in a Motor Vehicle (Count 5), a felony of the fourth degree in violation of R.C. 2923.16(A).

{¶6} A jury trial was held between December 12 and 15, 2022. The following testimony was presented:

{¶7} Evan Wolf testified that in April 2020 he lived with his fiancée at the Eastview Meadows Apartments in Eastlake, Ohio. On the morning of April 26, 2020, he was

2

awakened by multiple gunshots fired in quick succession. From his apartment window, he observed a black car speeding away. Afterwards, he noted that one of his windows had been hit as had the brick exterior of the apartment building.

{¶8} Cole Eden of the Eastlake Police Department responded to the reported shooting at Eastview Meadows. At the scene, he spoke with Wolf and another resident, Trina Jenkins, who was attempting to leave. Eden noted the damage to Wolf's window and the apartment building, collected shell casings and fragments, and impounded a parked vehicle that had also been hit.

{¶9} Robert Harris is the property manager at Eastview Meadows and provided surveillance video to the police officers from the day of the shooting. He described Eastview Meadows as a single apartment building divided into four sections of either two or three stories. Each section had its own entranceway. The entranceway was locked. Two keys were necessary to access an apartment – one for the entranceway and another for the apartment unit.

{¶10} Trina Jenkins testified that she lived at Eastview Meadows in a third-story apartment with Jackson who is the father of her child. Prior to April 2020, Jackson had moved out of the apartment and was not residing there at the time of the shooting.

{¶11} About a month prior to the shooting, Jenkins and Jackson had gone to Detroit to purchase drugs from Vincent Anderson aka "Ace." Jackson had given Anderson money for drugs, but Anderson kept the money without delivering the drugs. Also, prior to the shooting, Anderson had been at her apartment and knew where she lived.

3

{¶12} Jenkins was in contact with Jackson before and after the shooting on April 26. Throughout the morning prior to the shooting, Jackson and Anderson had been making threats against each other. She testified to seeing Anderson with a gun making threats against Jackson and his family through Facebook Live. In text messages prior to the shooting, Jackson told her that he was going to kill Anderson. Jackson also texted her that Anderson was not "worth it" and to delete the texts in which he said he would kill Anderson.

{¶13} After the shooting, Jackson texted Jenkins to leave the apartment and not to talk to the police. Jenkins was detained by the police and made several statements about what occurred. Initially, she told the police that she had seen Anderson fire shots at the apartment, but she denied this in later statements. At trial, she testified that she was unaware that Anderson was at her apartment building until Jackson told her that he was there. She did not observe Anderson with a gun at the time of the incident.

{¶14} Paul Stanley of the Eastlake Police Department collected evidence from the scene of the shooting, including ten shell casings.

{¶15} Alexa Dicillo testified that she has known both Jackson and Anderson for several years. On the evening of April 25, 2020, Dicillo and Anderson were staying at the Red Roof Inn in Mentor. During this time, she received a phone call from Jackson and he threatened to "shoot up" the house where her family lived as well as Anderson's home. She testified that Jackson repeatedly called her throughout the night. He also contacted her through FaceTime and she could see him with a gun. Dicillo claimed the argument between Jackson and Anderson began when Jackson stole a safe from a friend of

4

Anderson. Dicillo testified that, on the morning in question, Anderson went to Eastview Meadows to resolve the dispute with Jackson peacefully.

{¶16} Vincent Anderson testified that, prior to his appearance in court, he was granted immunity from prosecution by the trial court. Anderson was acquainted with Jackson through mutual friends and had been to his apartment at Eastview Meadows. Jackson told Anderson about stealing a safe from a friend of his, Xavier Burton. Upset about the theft, Anderson kept some money Jackson had given him for drugs. Afterwards, Jackson began sending threatening messages to him by phone/text and posting things about him on social media.

{¶17} On the weekend of April 25-26, 2020, Anderson was driven to Ohio by Phillip Herbruck to see Dicillo. They stayed together at a hotel that weekend. On the morning of April 26, Anderson and Jackson were sending insulting and abusive text messages to each other. In one text, Anderson told Jackson "[i]t's on yo baby dead" followed by two laughing with tears emojis. Anderson explained that he was not threatening Jackson's child by this text, but mimicking a threat sent earlier by Jackson. At some point, Jackson contacted Anderson by FaceTime/video chat and threatened to kill him. Anderson testified that Jackson had a gun and there were other people with him. Jackson also threatened Dicillo and both their families.

{¶18} Later that morning, Anderson contacted Herbruck to drive him to Jackson's apartment because he "[g]otta wack a ni**a." Anderson explained that he intended to fight Jackson because of the things he said but did not bring a gun or other weapon. At the apartment, Anderson tried the exterior door of the building but it was locked. Surveillance video showed Anderson briefly trying to open the door and peer through the

5

glass window into the hallway. He does not appear armed in the video. As Anderson returned to his car, he heard someone shout "Ace" (a nickname) and then begin shooting at him from another vehicle. Anderson ducked into the vehicle being driven by Herbruck and they fled to the highway where the vehicle broke down because a tire had been shot.

{¶19} Brian Santiago testified that he previously worked with Viapath Technologies which manages the phone systems for Ohio Department of Corrections and Rehabilitation facilities. At the State's request, he produced recordings of two telephone conversations between Peter Meade (an inmate) and Jackson made on April 26 and May 9, 2020. In these conversations, Jackson discusses the incident with Anderson. He describes arguing with Anderson and the threats they made to kill each other. He claims he found Anderson trying to break into his apartment with a crowbar and fired on him.

{¶20} Kevin Crowley testified that he was a patrol officer with the City of Willoughby Police Department. On the morning of April 26, 2020, he was dispatched to State Route 2 east of Lost Nation Road because of a tire in the road. About a half of a mile from the tire, Crowley located a black Dodge Charger that was missing a wheel and had sustained damage from gunfire. Phillip Herbruck was the only occupant of the vehicle. A search of the vehicle was conducted and a crowbar was found in the trunk.

{¶21} Phillip Herbruck testified that he was familiar with Anderson as a pill dealer who went by "Ace." Herbruck often drove Anderson around in exchange for pills. On April 25, 2020, Herbruck picked up Anderson in Detroit, drove him to Mentor, and rented a room for him at the Red Roof Inn. The next morning, Anderson had Herbruck drive him to an apartment building where somebody owed him money. Herbruck did not see Anderson with a gun and was not troubled by the text message from him about whacking

6

Case No. 2023-L-021

a ni\*\*a because Anderson did not seem prone to violence.  After parking in front of the apartment, Anderson walked up to the building but Herbruck did not pay attention to what he was doing.  After about ten minutes, Anderson returned to the car and told Herbruck to duck as the car was hit by gunfire.  The gunfire came from a white SUV.  As the SUV was turning around, Herbruck drove out of the parking lot and to the freeway where his vehicle became disabled when the rear tire fell off.  Anderson left the vehicle and ran away on foot.

{¶22}  Geoffrey Moran, a former intelligence analyst manager for the Ohio State Highway Patrol, testified regarding Sprint cell phone records documenting activity from Jackson's and Jenkins' cell phones.  These records demonstrated the approximate locations of Jackson and Jenkins around the time of the shooting.

{¶23}  Rebecca Silverstein-Groce, a forensic analyst at the Lake County crime lab, testified that the shell casings recovered from the parking lot of the apartment were nine-millimeter casings and were fired from the same weapon, possibly a thirty-caliber semiautomatic Glock.

{¶24}  Kraig Davis testified that he had no recollection of being involved in a shooting.  He then read a statement he had written for the police on May 1, 2020.  In the statement, he wrote: "I was dropping Will Jackson off at home that morning and we pulled up to his house and a guy was in front of his door and Will shot at him * * * and I pulled off because I was scared and left the scene."

{¶25}  Marc Christian, a detective for the Eastlake police department, investigated the incident and interviewed Jenkins.  Jenkins showed him the texts on her phone where Jackson stated that he wanted to kill Anderson and that Jenkins should delete those texts.

7

{¶26} William Jackson testified that he bought drugs regularly from Anderson prior to the shooting incident without any problems. Jackson denied stealing a safe from Burton as Anderson claimed. Normally, Jackson purchased the drugs in Lake County. A few weeks prior to the incident, Anderson offered him cheaper drugs if he would drive him to Detroit. So, Jackson drove Anderson to Detroit (with Jenkins in the car) but Anderson kept the money without delivering the drugs. In response, Jackson posted on social media that Anderson had robbed him. After posting, Anderson threatened to kill him. Because of Anderson's threats, Jackson bought a gun (a Glock).

{¶27} On the evening of April 25 to 26, 2020, Jackson was being driven around by Davis. At about 2:30 a.m., Jackson joined Anderson's Instagram Live. He and Anderson began trading insults. At one point, Anderson pointed a gun at the camera and threatened not only Jackson, but Jenkins and their child. In response, Jackson showed Anderson his (Anderson's) baby mother's Detroit address as a warning. Jackson and Anderson continued to communicate with each other through various media. Moreover, Jackson was in regular contact with Jenkins, and Jenkins and Dicillo were communicating with each other. Jackson tried to call Dicillo but was unable to reach her. On FaceTime, Anderson made graphic threats about raping Jenkins and slaughtering their child. Jackson communicated Jenkins' location to Anderson (although Anderson had already been to this apartment) as well as his current location (about two streets away from Jenkins' apartment).

{¶28} At about 9:30 that morning, Jackson had Davis drive him to the apartment so he could take drugs away from Jenkins which she had been abusing and because he wanted to gather some things to stay at a hotel. When he saw Anderson at the apartment,

8

Case No. 2023-L-021

he panicked. He thought Anderson was trying to pry the door open with a crowbar. Jackson yelled at Anderson and he responded, "I'll blow you right now," i.e., shoot you. He was scared that Anderson was at the apartment in order to carry out his threats and that is why he had his gun with him. Jackson saw Anderson reach for a gun on the right side of his body. Jackson pulled out his gun and fired two warning shots at the ground. Anderson then fired at Jackson. Davis began to speed away while Jackson fired multiple shots but only with an aim toward scaring him. When Anderson entered his vehicle, Jackson ceased firing because Anderson was no longer brandishing his firearm. Davis drove quickly to the freeway.

{¶29} Jackson did not contact the police after the incident and did not want any involvement with the police. He stayed in a hotel and cut his hair to avoid arrest by the police. He sold the gun he used in the shooting and wanted to ensure the neither the police nor Jenkins took possession of his cell phone which was never recovered. He advised Jenkins to leave the apartment and not to talk to the police. When Jackson learned that Davis would be testifying, he advised him to plead the fifth and claim that he only made a statement out of fear. When Jackson learned that Anderson had received immunity for his testimony, he posted on social media that he was a snitch.

{¶30} The jury found Jackson guilty of all five charges.

{¶31} On January 13, 2023, the trial court issued its Judgment Entry of Sentence. The court found that Felonious Assault (Count 2) and Improperly Handling Firearms in a Motor Vehicle (Count 5) merged into Attempted Murder (Count 1). For Attempted Murder (Count 1), the court ordered Jackson to serve a minimum of four years and maximum of six years in prison with a mandatory three years for the firearm specification under R.C.

9

2941.145 and a mandatory five years for the firearm specification under R.C. 2941.146. For Improperly Discharging a Firearm at or into a Habitation or School Safety Zone (Count 3), the court ordered him to serve two years in prison with a mandatory three years for the firearm specification under R.C. 2941.145. For Improperly Discharging a Firearm at or into a Habitation or School Safety Zone (Count 4), the court ordered him to serve two years in prison. The sentences for Counts 3 and 4 were ordered to be served concurrently with each other and consecutively to Count 1. The mandatory firearm specification sentences were ordered to be served consecutively with each other and consecutively to Count 1. Jackson's stated aggregate minimum prison sentence was seventeen years and the aggregate maximum sentence was nineteen years.

{¶32} On February 28, 2023, Jackson filed a Notice of Appeal. On appeal he raises the following assignments of error:

> [1.] The trial court erred when it engaged in vindictive sentencing after Jackson's second trial.
>
> [2.] The trial court erred when it permitted the State to call Alexa Dicillo as a witness when the existence of the witness had not been previously disclosed.
>
> [3.] The convictions were against the manifest weight of the evidence.
>
> [4.] Jackson was denied the right to the effective assistance of counsel when counsel failed to request a jury instruction on the castle doctrine.
>
> [5.] There was insufficient evidence against Jackson.

{¶33} The assignments of error will be considered out of order.

10

Case No. 2023-L-021

{¶34} In the second assignment of error, Jackson argues that the trial court erred in allowing Dicillo to testify over the objection of defense counsel when she was not identified by the State as a potential witness until the eve of trial.

{¶35} Discovery in criminal trials is governed by Criminal Rule 16. The purpose of the Rule is "to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendant, and to protect the well-being of witnesses, victims, and society at large." Crim.R. 16(A); *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). Under the Rules of discovery, "[e]ach party shall provide opposing to counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." Crim.R. 16(I).

{¶36} "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1). The sanction to be imposed for a violation of Criminal Rule 16 is discretionary with the trial court. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 20.

{¶37} "A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Papadelis* at paragraph two of the syllabus; *Darmond* at syllabus ("[t]he holding in *Lakewood v.*

11

*Papadelis* * * * applies equally to discovery violations committed by the state and to discovery violations committed by a criminal defendant"). The Supreme Court of Ohio has "established three factors that should govern a trial court's exercise of discretion in imposing a sanction for a discovery violation committed by the prosecution": "(1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced." *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus.

{¶38} In the present case, the State disclosed Vincent Anderson as a potential witness to Jackson on October 7, 2022. Anderson had not been contacted by the State prior to Jackson's first trial and was not a witness in that trial. Before Anderson would speak with the State, the State sought immunity for Anderson. The trial court granted Anderson immunity on December 1, 2022. The State learned of Dicillo's existence after speaking with Anderson on December 8 (Thursday) and advised Jackson that it intended to call her as a witness on December 9 (Friday). Trial began on December 12 (Monday) and Dicillo testified on December 13 (Tuesday).

{¶39} The State argued for Dicillo to be allowed to testify as follows:

> The State had learned of her existence on Thursday when we spoke with Mr. Anderson. We were unable to speak with Mr. Anderson until last week because he was waiting for the Court to grant him immunity. At which time when the State was able to set up a meeting with him and we learned of her existence at that time. Immediately upon learning of her relevance to this case the State provided her name and address to defense counsel. I also provided her LEADS, her criminal history to defense counsel yesterday [Monday]. I provided defense counsel with her cell phone number. And also Miss Dicillo informed me and [defense counsel] informed me that Miss Dicillo had called the public defender's office yesterday and spoke with their chief Melissa Blake. The State should be permitted to call

12

Case No. 2023-L-021

her. We received just as much notice as defense did in this case and I think the appropriate remedy for this if defense counsel is not prepared to cross her would be to ask for a continuance.

**{¶40}** Defense counsel's response focused on the ability to impeach Dicillo's claim that Jackson called her repeatedly in the hours before the shooting. The Sprint telephone records produced by the State did not substantiate this claim. But they did not disprove Dicillo's claim inasmuch as certain types of calls or communications with the witness would not be reflected in the records. Defense counsel argued: "it really has to go to the fact [that] as the defense we would have done additional research into specifically how the cell phone records would have worked related to the Wi-Fi if we had known that this person was claiming forty phone calls on a log that appears to have one [call] that was 0 seconds." Defense counsel did not seek a continuance but the exclusion of the witness.

**{¶41}** We find no abuse of discretion in the decision to allow Dicillo to testify. We do not find the violation willful, but more significantly we do not find it prejudicial.

**{¶42}** Although the failure to disclose Dicillo was not intentionally willful, it was negligent. The failure to develop the testimony of the principal victim of the shooting (Anderson) for over two years after the event was candidly described by Detective Christian as "dropping the ball." The sooner the State would have spoken to Anderson the sooner Dicillo's existence would have been known. Conversely, her existence was not a surprise to Jackson. In his testimony, he admitted that he knew Dicillo and that she was Anderson's girlfriend at the time of the shooting. He also testified to seeing Dicillo with Anderson on FaceTime in the hours just before the shooting while they were exchanging threats.

13

Case No. 2023-L-021

{¶43} As to prejudice, Dicillo's testimony was not especially impactful. She testified that Jackson called her about forty times that morning and he denied doing so. The Sprint records are inconclusive on this issue, but the issue is not probative of anything material in the case. She testified that Jackson made threats about killing Anderson and Jackson admitted that he made threats about killing Anderson. She testified that Jackson had a gun and this fact was never in dispute. She testified that Anderson did not have a gun and went to Jackson's apartment with peaceful intentions. While this testimony is relevant it was of dubious probative value. Anderson's purportedly peaceful intentions were contradicted by Anderson's own testimony that he went to the apartment to fight and/or whack a ni**a. Moreover, Dicillo was not with Anderson at the apartment. Whether he was brandishing a weapon on FaceTime is not unrelated to but not determinative of whether he brandished a gun when confronting Jackson at the apartment. Herbruck was at the apartment and did not see Anderson with a gun. Anderson did not appear with a gun on the surveillance video. Davis did not mention that Anderson had a gun. Compared with the other evidence from the scene of the shooting, Dicillo's testimony that Anderson did not have a gun at the hotel hours before the shooting is of comparatively little weight. Finally, it is not apparent how a continuance (if defense counsel had sought one) would have allowed defense counsel to undermine or impeach Dicillo's testimony that she did not observe Anderson with a gun in the hotel room. Jackson and Jenkins both testified that he did have a gun during the social media exchanges, and it is uncertain what more the defense could have offered if it had known that Dicillo was going to be a potential witness.

{¶44} The second assignment of error is without merit.

14

Case No. 2023-L-021

**{¶45}** In the fourth assignment of error, Jackson argues trial counsel was ineffective for not requesting a jury instruction on the castle doctrine.

**{¶46}** "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus; *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000). Several Ohio appellate courts have "found that the failure for the jury to be given a castle doctrine instruction was reversible error, under a plain error standard or due to ineffective assistance of counsel." *State v. Thomas*, 2019-Ohio-2795, 139 N.E.3d 1253, ¶ 44 (11th Dist.).

**{¶47}** The castle doctrine is a common-law rule that obviates the duty to retreat when raising a claim of self-defense. It holds that "there is no duty to retreat when one is assaulted in one's own home." *State v. Thomas*, 77 Ohio St.3d 323, 327, 673 N.E.2d 1339 (1997). As codified in former R.C. 2901.09(B) at the time of the shooting, "a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence." Applying the law in effect at the time of the shooting, this court previously held that Jackson was not entitled to the castle instruction because he was not in his residence at the time of the shooting. *Jackson*, 2022-Ohio-3483, at ¶ 21 ("[t]he cases Mr. Jackson cites in support of his argument are clearly and fatally distinguishable as the facts of those cases did not involve a shooting in a parking lot, but took place in dwellings, as defined by statute").

**{¶48}** When Jackson claims trial counsel was ineffective in the present appeal, he relies upon the amended version of R.C. 2901.09(B) effective April 6, 2021 (the "stand

15

your ground" law) which provides that "a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be." The issue of whether amended R.C. 2901.09(B) is to be applied retroactively to events occurring before its amendment has divided Ohio's appellate courts and is currently pending before the Supreme Court of Ohio. *See State v. Terry*, 2023-Ohio-2234, __ N.E.3d __, ¶ 16 (9th Dist.). This district has held that the amended statute does apply retroactively to events occurring prior to its amendment. *State v. Wagner*, 2022-Ohio-4051, 200 N.E.3d 1192, ¶ 28 (11th Dist.), *appeal accepted for review* 169 Ohio St.3d 1467, 2023-Ohio-773, 205 N.E.3d 548.

{¶49} We find the issue is irrelevant in the present case inasmuch as the jury was instructed that "the defendant had no duty to retreat before using force in self-defense" and that, "in determining whether the defendant, in using force in self-defense, reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety, you may not consider the possibility of retreat by the defendant." Regardless of whether defense counsel expressly requested a "castle" instruction, the jury was instructed in a manner consistent with the current version of R.C. 2901.09(B).

{¶50} The fourth assignment of error is without merit.

{¶51} The third and fifth assignments of error will be considered jointly. Under the fifth assignment, Jackson maintains that the trial court erred in denying his Criminal Rule 29 motion for acquittal on the grounds of self-defense. Under the third assignment of error, he similarly maintains that the jury's failure to find that he had acted in self-defense was against the weight of the evidence.

16

{¶52} Criminal Rule 29(A) provides that "[t]he court * * * shall order the entry of a judgment of acquittal of one or more offenses charged * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶53} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the weight of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Barnes*, 11th Dist. Trumbull No. 2022-T-0061, 2023-Ohio-353, ¶ 43.

{¶54} In order to convict Jackson of Attempted Murder, the State was required to prove beyond a reasonable doubt that he "purposely * * * engage[d] in conduct that, if

17

successful, would" have "cause[d] the death of another."  R.C. 2923.02(A) and 2903.02(A).  To convict Jackson of Improperly Discharging a Firearm at or into a Habitation or School Safety Zone, the State was required to prove beyond a reasonable doubt that he, "without privilege to do so, * * * knowingly * * * [d]ischarge[d] a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."  R.C. 2923.161(A)(1).  "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be."  R.C. 2901.05(B)(1).

{¶55}  "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense," i.e., "if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden."  *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 25.  Where, as here, the defendant satisfies this burden of production, the prosecution must satisfy the "burden of disproving the defendant's self-defense claim beyond a reasonable doubt," i.e., the burden "of persuading the jury beyond a reasonable doubt that [the defendant] was not acting in self-defense when he [used force against another]."  *Id.* at ¶ 27, 26.

18

Case No. 2023-L-021

{¶56} The elements of a self-defense claim include the following: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *Id.* at ¶ 14.

{¶57} Jackson's arguments under the third and fifth assignments of error turn on whether the State satisfied its burden of disproving his self-defense claim beyond a reasonable doubt. Focusing on the second element, the State needed to disprove that Jackson had a bone fide belief that he or another was in imminent danger of death. Arguably, Jackson could have fired upon Anderson to protect himself or Jenkins (Jackson was aware their child was not at the apartment). With respect to Jenkins, Jackson testified that he believed Anderson was breaking into the apartment with a crowbar to fulfil his threat to murder Jenkins. The State introduced the following contrary evidence: Jackson knew the door to the apartment building would be locked as would be the door to his unit on the third floor; Anderson denied that he had a crowbar or tried to pry open the exterior door; the surveillance video does not depict Anderson with a crowbar or trying to otherwise pry open the exterior door; Herbruck testified that Anderson did not have a crowbar (although there was one in the trunk of his car); and, while Jackson claimed to believe Anderson had a crowbar, he never testified to actually seeing him with a crowbar. The foregoing is both sufficient and compelling evidence that Jackson did not fire upon Anderson because he had a bona fide belief that Anderson was breaking into his apartment to murder his girlfriend.

19

{¶58} Jackson testified that he did not actually fire upon Anderson until after calling him and getting his attention. After Anderson was aware of his presence, Jackson claimed he drew a gun and threatened to immediately shoot him. Again, contrary to Jackson's testimony that Anderson was about to shoot him is the evidence of Anderson's and Herbruck's testimony that he did not have a gun and the evidence of the surveillance video (that Anderson was at least not brandishing a weapon when he tried to enter the apartment building). In addition to this direct evidence that Anderson was unarmed, there was circumstantial evidence that the incident was not a random encounter unanticipated by Jackson: in addition to posting the address for the apartment, Jackson posted specific information about the apartment ("the blue apartments" and "across the street from Walmart"); there was no damage to Davis' vehicle or physical evidence of another gun being fired; Jackson tried to avoid arrest, sold his gun, and worried about the police finding his cell phone; Jackson asked Jenkins to delete texts expressing his desire to kill Anderson and told her not to speak with the police; and Jackson discouraged Davis from cooperating with the police.

{¶59} We recognize that there was also evidence that supported Jackson's self-defense claim. Anderson had been making threats against Jackson and requested a ride from Herbruck to the apartment to whack a ni**a (contrary to Jackson's brief, this was not Anderson's purpose in coming to Ohio but only in coming to the apartment after the quarreling with Jackson throughout the morning). Ultimately, the issue is one of credibility – whether the jury found Jackson or Anderson the more credible witness. Here, the balance of corroborating evidence supports Anderson's version of events. But, even if it

20

were otherwise, courts of appeal are properly deferential to the trier of fact where the choice is between two plausible but contradictory versions of events:

> "A self-defense claim is generally an issue of credibility." *State v. Olsen*, 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. "Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact." *State v. Bentley*, 2023-Ohio-1792, __ N.E.3d __, ¶ 24 (11th Dist.). "'[A] conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version' and rejected the defendant's claim of self-defense." *Id.*, citing *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 49 (10th Dist.). When weighing witness testimony supporting a claim of self-defense, the trier of fact is "free to believe or disbelieve the testimony of the witnesses" and "is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible." *Bentley* at ¶ 24, citing *State v. Haney*, 11th Dist. Lake No. 2012-L-098, 2013-Ohio-2823, ¶ 43. It is evident that the jury chose to believe the testimony of the State's witnesses and we will not second-guess that determination.

*State v. Knowlton*, 11th Dist. Ashtabula No. 2023-A-0013, 2023-Ohio-3759, ¶ 24.

{¶60} The third and fifth assignments of error are without merit.

{¶61} Under the first assignment of error, Jackson argues that the trial court engaged in vindictive sentencing when it imposed a longer sentence after he successfully appealed the convictions in his first trial.

{¶62} An appellate court "may vacate [a felony] sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under * * * (C)(4) of section 2929.14 * * * [or] [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a) and (b). "[A] sentence vindictively imposed on a defendant for exercising his constitutional right to a jury trial is contrary to law." *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 8; *see North Carolina v. Pearce*, 395 U.S. 711, 725,

21

89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) ("[d]ue process of law * * * requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial"); *Alabama v. Smith*, 490 U.S. 794, 798, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989) ("[w]hile sentencing discretion permits consideration of a wide range of information relevant to the assessment of punishment * * * it must not be exercised with the purpose of punishing a successful appeal").

{¶63} "In Ohio, it has generally been held that 'a presumption of vindictiveness arises when the same judge imposes a harsher sentence following a successful appeal.'" (Citation omitted.) *State v. Ferrell*, 2021-Ohio-1259, 170 N.E.3d 464, ¶ 17 (11th Dist.). "In order to overcome the presumption of vindictiveness, the trial court must make affirmative findings on the record regarding conduct or events that occurred or were discovered after the original sentencing." *State v. Watson*, 2023-Ohio-1469, 213 N.E.3d 1175, ¶ 33 (5th Dist.); *Ferrell* at ¶ 20, citing *Pearce* at 726 ("when a more severe sentence is imposed by a judge 'the reasons for his doing so must affirmatively appear,' they must be 'based upon objective information' and 'the factual data upon which the increased sentence is based must be made part of the record'"). The findings necessary to rebut a presumption of vindictiveness have been described thus:

> When the same sentencer acts in both instances, giving rise to the presumption of vindictiveness, the explanation required by *Pearce* is not avoided merely because of some differences in the two proceedings. It is the sentencer's explanation of how those differences affected the sentencer's calculus in imposing a harsher sentence that operates to dispel the defendant's apprehension that exercising his right of appeal could work to his prejudice in this way. *Pearce*. Therefore, when the presumption arises but the sentencer fails to articulate the required explanation, the presumption of vindictiveness is not rebutted.

22

*State v. Howard*, 174 Ohio App.3d 562, 2007-Ohio-4334, 883 N.E.2d 1077, ¶ 23 (2d Dist.).

{¶64} In the present case, Jackson was tried and sentenced by the same judge in both trials. After the first trial, he received an aggregate minimum sentence of eleven years and a potential maximum sentence of twelve and a half years. After the second trial, the aggregate minimum sentence was seventeen years and the potential maximum sentence was nineteen years – a difference of six to six and a half years. We acknowledge that there were notable differences in the way the sentence was imposed after each trial. At the second sentencing, the court increased the sentence for Attempted Murder but decreased the sentences for Improperly Discharging a Firearm at or into a Habitation or School Safety Zone; Jackson received a sentence for Improperly Handling Firearms in a Motor Vehicle after the first trial but after the second trial this count was merged with Attempted Murder; the sentences ran concurrently after the first trial (except for the firearm specifications) but after the second trial the sentence for Aggravated Murder was ordered to be served consecutively; and, lastly, the court imposed different sentences for the firearm specifications after each trial. Despite the differences in the manner the sentences were structured, the increased sentence of six to six and a half years raises the presumption of vindictiveness.

{¶65} The trial court made the following observations at sentencing following retrial:

> So in this trial we had, the difference between this trial and the trial in December of '20 was there was additional evidence, additional testimony and off the top of my head additional information was the phone calls from Meade and the fact that Kraig Davis had an extreme lapse of memory during this trial that he did not have during the first

23

trial, the testimony of Anderson and the letter that Mr. Jackson sent out on the cell phone immediately preceding this trial [resulting in Anderson being identified as a snitch on social media], I think it was immediately preceding the trial so that wasn't information that was available at the first trial.

{¶66} The foregoing succinctly highlights the differences in evidence presented at the two trials, but it fails to explain how the additional evidence affected the trial court's reasoning in the imposition of sentence. As this court has noted, the existence of new evidence or circumstances that "may justify the increase in sentence" is not sufficient to rebut the presumption of vindictiveness, rather, "it has consistently been required that a trial court state on the record reasons for the increase in the sentence in order to combat the presumption of vindictiveness." *Ferrell*, 2021-Ohio-1259, at ¶ 23. This deficiency is evident when considering the imposition of the consecutive sentences which augmented Jackson's aggregate sentence. The court found: "As the testimony was of the round being fired at or into the apartment complex, it's a very serious danger to the public. At least two of these offenses were committed as part of one or more course[s] of conduct and the harm caused by at least two of the offenses were so great or unusual [that] no single prison term for any of the offenses committed as part of a course of conduct that adequately reflects the seriousness of the conduct." These findings are just as supportable by the evidence introduced at the first trial as they would be by the evidence introduced at the second trial. They provide no insight at all into why the court felt concurrent sentences were adequate after the first trial but consecutive sentences were merited after the second trial. *Note also State v. Gwynne*, __ Ohio St.3d __, 2022-Ohio-4607, __ N.E.3d __, ¶ 29 (there must be an "evidentiary basis" that is "adequate to fully

24

Case No. 2023-L-021

support the trial court's consecutive-sentence findings"), *vacated on other grounds*, __ Ohio St.3d __, 2023-Ohio-3851, __ N.E.3d __ (plurality opinion).

{¶67} The first assignment of error is with merit.

{¶68} For the foregoing reasons, Jackson's convictions for Attempted Murder and Improperly Discharging a Firearm into a Habitation are affirmed. Jackson's sentence is reversed and this case is remanded for further proceedings consistent with this Opinion. Costs to be taxed against the parties equally.

JOHN J. EKLUND, P.J., concurs,

MARY JANE TRAPP, J., concurs in part and dissents in part with a Dissenting Opinion.

_____

MARY JANE TRAPP, J., concurs in part and dissents in part with a Dissenting Opinion.

{¶69} I respectfully dissent from the majority's disposition of Mr. Jackson's first assignment of error and its determination that the trial court engaged in vindictive sentencing. Because I find the record clearly and convincingly demonstrates the trial court based the harsher sentence after retrial on consideration of new evidence that shed new light on the nature and extent of Mr. Jackson's criminal conduct from witnesses who did not testify at the first trial, the presumption of vindictiveness has been rebutted.

{¶70} After acknowledging that the trial court listed with specificity and in detail the new evidence upon which it based its sentence, the majority effectively imposes a new requirement: the trial court must also write a dissertation setting forth its subjective

25

Case No. 2023-L-021

reasoning underlying the evaluation of the evidence, consideration of the sentencing factors, and resultant increase in the sentence. Such a prolegomenon is not statutorily required nor is it imposed in any opinion addressing the presumption of vindictiveness and how it may be overcome.

{¶71} When the same trial judge imposes a harsher sentence upon a criminal defendant upon remand after a reversal on appeal, there is a presumption of a vindictive sentence, which may, however, be overcome with a suitable explanation for the harsher sentence. *See North Carolina v. Pearce*, 395 U.S. 711, 725-726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). A suitable explanation may consist of conduct or events discovered since the prior sentencing that throw "new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.'" *Id*. at 723, quoting *Williams v. New York*, 337 U.S. 241, 245, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). *See also Texas v. McCullough*, 475 U.S. 134, 143, 106 S.Ct. 976, 89 L.Ed.2d 104 (1986) (presumption overcome when two additional witnesses at the retrial provided information concerning the defendant's participation in the crime).

{¶72} Here, the trial court's recitation of the additional evidence not presented at the first trial *is* the explanation of "conduct or events" that formed the basis for a harsher sentence contemplated by the case law. The trial court explained its rationale by describing the events or conduct that threw "new light" on Mr. Jackson's "conduct," "life," or "propensities": phone calls between Mr. Jackson and a prison inmate in which Mr. Jackson describes the incident; the mutual threats of Mr. Jackson and Mr. Anderson to kill each other and the admission that Mr. Jackson fired upon Mr. Anderson; the stark contrast in Mr. Davis' recollection during the two trials about whether a shooting occurred

26

at all; and the testimony from the victim, who did not testify at the first trial, about Mr. Jackson's texts threatening to mark him as a "snitch" via social media. What more needed to be said to justify the increased sentence?

{¶73} Finally, the majority's reliance on *State v. Gwynne*, __ Ohio St.3d __, 2022-Ohio-4607, __ N.E.3d __, regarding the trial court's imposition of consecutive sentences is unavailing, inasmuch as the Supreme Court of Ohio vacated and superseded that decision on reconsideration. *See* Slip Opinion No. 2023-Ohio-3851.

Case No. 2023-L-021